## JOHN RIPPY V. THE STATE.

No. 14387.   Delivered June 3, 1931.
Rehearing Granted June 24, 1932.
State's Rehearing Denied October 26, 1932.
Reported in 53 S. W. (2d) 619.

*Lattimore, Judge,* dissenting.

The opinion states the case.

*Robt. H. Hopkins,* of Denton, *Alvin M. Owsley,* of Dallas, *Owsley & Owsley,* of Denton, and *Dan Moody,* of Austin, for appellant.

*Earl Street,* County Attorney, and *B. T. Fitzhugh,* Asst. Co. Attorney, both of Denton, *E. M. Overshiner,* Special Prosecutor, of Abilene, and *Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, JUDGE.—The offense is murder; the punishment, confinement in the penitentiary for 35 years. A former appeal is found reported in 113 Texas Crim. Rep., 578, 24 S. W. (2d) at page 841.

Appellant had leased his filling station to deceased, John Hornsby. The lease was to expire August 1, 1928. The homicide occurred at the filling station on July 25, 1928. It was the theory of the state that appellant killed deceased in order that he might get immediate possession of the filling station. In support of this theory the state offered testimony to the effect that appellant stated to the county attorney that he did not like the way deceased carried on his business; that he was having some trouble with deceased; that the county attorney might have to prosecute him for something else besides running a slot machine. It appears that the county attorney had theretofore forced appellant to take a slot machine out of his place of business. On the question of appellant's desire to obtain

immediate possession of his filling station, witnesses for the state testified, in substance, that appellant had made arrangements shortly prior to the homicide to lease his filling station to another man, and that it was his desire to place said party in immediate possession. It was further in evidence, from state's witnesses, that appellant had expressed disgust at the fact that deceased would not sell intoxicating liquor at the station.

Hornsby, with a shotgun wound in his body, was found dead at his filling station shortly after 6 p. m. His watch, which had been struck by some shot, had stopped at 6:09 p. m. Appellant was seen at the filling station carrying a 12-gauge single-barrel shotgun a short time before the body of deceased was found. Two boys were at the filling station when appellant approached. After buying some soda water, they left appellant and deceased at the filling station, and rode up the highway on their bicycles. At the time they left the station there was no one there except appellant and deceased. After traveling up the road some distance these boys heard two shots, which they testified sounded like the reports of a shotgun. Immediately after the second shot was fired one of the boys, according to his testimony, looked back toward the filling station and saw appellant standing near the station with a shotgun in his hand. He could not see deceased. Tracks led from the filling station to appellant's house, where he was arrested less than an hour after the killing. A shotgun shell which fitted appellant's gun was found near the body of deceased. Witnesses testified that it was a Super-X shell. The plunger had marked the shell below the cap. Witnesses testified that in their opinion the shell had been recently fired. When appellant was arrested a single-barrel shotgun and several shells were found in his house, and a Super-X shell, which had been fired, was found just outside appellant's door. The shell found outside the door showed that the plunger had made a mark below the cap. The shells found in the house were not Super-X shells. The arresting officer, Howerton, testified to having made an experiment with appellant's gun for the purpose of determining where the plunger struck the shell. Removing the powder and shot from one of the shells found in the house of appellant, the officer placed it in appellant's gun and pulled the trigger. The plunger struck the shell below the cap, at approximately the same place as found on the shell outside the door and the one picked up near the body of deceased. Two state's witnesses testified that they had borrowed appellant's

gun shortly before the homicide, and that, upon returning it, they had given appellant several Super-X shells. Officer Howerton testified that appellant's shoes fitted the tracks leading from the filling station to appellant's home. There was a cartridge in appellant's gun at the time he was arrested. It had been snapped three times, according to the testimony of Howerton. It appeared that each time the cartridge had been snapped it had been turned around in the gun. Following the tracks from the filling station to the house, arresting officer Howerton came to appellant's residence. Upon being called, appellant came to the door, and, according to the testimony of the officer, the following conversation ensued: "I said 'Mr. Rippy I was making an investigation and I thought may be you might be able to give me some information. Did you happen to hear any shots fired down near the underpass this afternoon?'" According to the version of the officer, appellant answered in the negative, and then hesitated for a moment and said: "That old man was a good old man. I was down there at two o'clock and haven't been back since." The officer said that appellant made the statement before he had advised him (appellant) that deceased had been killed. Several witnesses for the state testifid that they passed the filling station after 6 p. m. but did not see deceased. When the body of deceased was searched, some checks and a sum of money amounting to approximately twenty-two dollars were found. There was nothing to indicate that he had been robbed.

Testifying in his own behalf, appellant denied the killing. It was his theory that deceased was killed by hijackers. In support of this theory, he placed on the stand a witness who testified that he had seen some rough looking men in an automobile at the filling station shortly before the death of deceased. He said that these parties appeared to be drinking, and that they had a shotgun in their car. Appellant and several of his witnesses testified to friendly relations existing between appellant and deceased. Appellant said that he left the filling station shortly after meeting some boys there on bicycles. On his way home, according to his version, he shot at a rabbit and snapped his gun in an effort to shoot a second time. He denied that he owned any Super-X shells and declared that the shell found by deceased's body had not been in his gun. Appellant testified that some time before the homicide he had shot at a rabbit in the yard. Appellant admitted that the shells found in the house belonged to him. A witness for appellant testified that he had talked to appellant about leasing his filling

station and appellant had stated that it was all right with him for deceased to keep the filling station until August 1st, the date his lease expired. Appellant offered two or three witnesses who testified that they passed the filling station shortly after 6 o'clock and saw deceased there alone, and that he was alive. Several witnesses testified that appellant's general reputation for being peaceable and law-abiding was good.

The court gave a charge covering the law of circumstantial evidence. It seems to be appellant's position that the testimony of his witnesses to the effect that they saw deceased alive after 6 o'clock destroyed the state's case. Attention is called to the fact that witnesses for the state testified that they passed the filling station shortly after 6 o'clock and did not see deceased. Moreover, at the time the shots were fired one of the state's witnesses, according to his version, looked back towards the filling station and saw appellant, with a shotgun in his hand. He could not see deceased. Without again detailing the facts and circumstances in evidence, the opinion is expressed that the circumstances are sufficient to meet the measure of the law. We quote the rule as announced in Branch's Annotated Texas Penal Code, sec. 1875, as follows: "In order to warrant a conviction on circumstantial evidence each fact necessary to establish defendant's guilt must be proven by the evidence to the satisfaction of the jury beyond a reasonable doubt; all such facts must be consistent with each other and with the defendant's guilt, and all the circumstances taken together must be of a conclusive nature leading on the whole to a satisfactory conclusion and producing in effect a reasonable and moral certainty that the defendant committed the offense charged, and must exclude every other reasonable hypothesis except that of defendant's guilt." In support of the text many authorities are cited, among them being Baldez v. State, 37 Texas Crim. Rep., 413, 35 S. W., 664, and Blount v. State (Texas Crim. App.), 64 S. W., 1050.

Bill of exception No. 1 is concerned with the refusal of the trial court to change the venue. It was averred in the application that there existed in Denton county so great a prejudice that appellant could not obtain a fair and impartial trial. Appellant offered three witnesses who testified, in substance, that in their opinion, appellant could not obtain a fair and impartial trial. Six witnesses for the state entertained an opinion to the contrary, and testified that they were well acquainted in the county and had come in contact with the citizenship since the commission of the offense. They said that they had not heard

the case generally discussed, and were of the opinion that there was no prejudice against appellant. The testimony pro and con presented conflicting theories. It is the rule that if conflicting testimony as to prejudice arises from the evidence, the trial court has the discretion of adopting either theory, it being his duty to weigh the evidence. A judgment denying the application will not be disturbed on appeal unless it be made to appear that the trial court abused its discretion. McNeely v. State, 104 Texas Crim. Rep., 263, 283 S. W., 522; Shelburne v. State, 111 Texas Crim. Rep., 182, 11 S. W. (2d) 519; Davis v. State, 120 Texas Crim. Rep., 114, 28 S. W. (2d) 794. We are unable to reach the conclusion that the record reflects an abuse of the discretion vested in the trial court.

Bills of exception Nos. 4, 8 and 9 relate to appellant's objections to testimony of arresting officer Howerton touching the result of his search of appellant's residence and premises, and, further, to his testimony relative to certain experiments he made with appellant's shotgun and the cartridges found in his house and on his porch. The specific objection to this testimony was that the arrest of appellant was illegal in that the officer had no warrant; that a contemporaneous search was not warranted in view of the fact that the arrest was illegal; and that the officer had no right to take appellant away from the premises and thereafter return and make a search of the house and premises without having secured a search warrant. We deem it proper to quote the court's qualification appended to the bills, as follows: "The defendant testified that the shotgun found in his house by witness Howerton and identified by Howerton on the trial was his shotgun and that it was the same shotgun that he carried with him to deceased's filling station shortly before the deceased met his death and that he took it back to his house and that it was in his house and in the same room where the witness Howerton testified he saw it when he first went into the house with the defendant when defendant wanted to put on his shoes. The defendant further testified that he owned and had 7 or 8 shotgun shells in said room of his house at the time the witness Howerton was with him, and that they were the same gauge and size shells as those identified by the witness Howerton as having been found by him in said room of the defendant's house. The defendant further testified that his shells which were in the room at the time Howerton was there were red, as he remembered. He testified that his shells were size twelves. The defendant further testified that a shell was in his shotgun at the time the witness

Howerton was in the house with the defendant, and that it had been snapped twice, but that he did not think he had snapped it three times. The witness Howerton testified that he was not positive whether he found the shell that was on the porch at the time he was there in the house with defendant or whether he found it when he went to the house the second time, but that it seemed to him that he found it on the second time he was at the house. The witness Gale, in answer to questions propounded by the defendant, testified that he had seen the defendant many times carrying his shotgun around about his premises, hunting rabbits; and that rabbits were plentiful that spring before the homicide, and that it was not uncommon to see the defendant and all the other people out there carrying shotguns. Defendant's wife, in answer to questions propounded by defendant, testified that the defendant killed a rabbit near 'the mulberry tree' close to the house some two months before the homicide, and the defendant testified that he was a rabbit hunter and usually carried about two shells with him when he hunted."

The state introduced in evidence the Super-X shell found by the witness Howerton near the body of deceased. Also the state introduced in evidence appellant's gun, the cartridges found in his house, the empty shell found on appellant's porch, and the cartridge found in the gun at the time the officer took it. Touching the shells which were later introduced in evidence, the witness Hooper testified, without objection, as follows: "The shell which you have handed me is the one that was picked up in front of the filling station and near the body of Mr. Hornsby. There was quite a number of shotgun shells in the box turned over to you. The box of shells which you have handed me appear to be the same shells which were turned over to you. None of these shells in the box had been fired; but there was an empty shell—I believe this is the shell here (indicating). Mr. Howerton turned those shells over to me and I turned all of those shells over to you when I ceased to be county attorney."

We deem it unnecessary to determine whether the search of appellant's residence and premises was illegal. The officer's testimony touching the obtaining of appellant's gun and the cartridges found in the house, if erroneously received, would not warrant a reversal for the reason that appellant, testifying in his own behalf, revealed to the jury the same facts as were disclosed by the testimony of the officer. Bonilla v. State, 108 Texas Crim. Rep., 603, 2 S. W. (2d) 248; McLaughlin v. State,

109 Texas Crim. Rep., 307, 4 S. W. (2d) 54; Kelsey v. State, 109 Texas Crim. Rep., 275, 4 S. W. (2d) 548; Kitchens v. State, 111 Texas Crim. Rep., 45; 10 S. W. (2d) 999; Poteet v. State, 112 Texas Crim. Rep., 466, 17 S. W. (2d) 46. Appellant identified the gun as being his property, and testified that he had some cartridges in the house which looked like the cartridges received in evidence.

As to the officer's testimony touching the experiment, it is observed that it was in evidence without objection that the mark on the shell found near deceased's body was below the cap, and that that made by the officer with appellant's gun on one of the cartridges found in appellant's residence was below the cap. This was the question for solution: Had the cartridge found near the body of deceased been fired by appellant's gun? The mark found on the cartridge in the yard added nothing to the proof that the plunger of appellant's gun struck a cartridge at a particular place. The jury had before them the cartridge upon which the experiment had been made, as well as the cartridge found by the body of deceased. They saw where the plunger had struck the cartridges. Appellant's wife testified that when appellant's gun was returned to him by state's witnesses they told appellant that they had a high powered shell in it; that the morning after the gun had been returned appellant shot that same shell at a rabbit in their yard. A state's witness had testified that the shell in the gun at the time he returned it was a Super-X. Appellant testified that he fired his shotgun at a rabbit on his way home from the filling station. He did not say what he did with the shell after he fired the gun. In the light of all of the circumstances, if the shell found on appellant's porch ought not to have been received in evidence, the opinion is expressed that the error is not reversible. Particularly is this true in view of the fact that it is fairly inferable from the record that state's witness Hooper identified the same shell as having been received by him from officer Howerton. His testimony relative to the matter was not objected to by appellant. We quote from Texas Jurisprudence, vol. 4, page 587, as follows: "It is a general rule also that the admission of improper evidence does not constitute reversible error if the same facts were proved by other and proper testimony or by evidence which was not objected to, as where the accused voluntarily gave testimony substantially the same as that erroneously received over objection. For example, a judgment will not be reversed because of admission of testimony of officers respecting facts ascertained upon an illegal

search where the same facts were testified to by other witnesses or by the appellant himself." Many cases are cited in support of the text, among them being Diaz v. State, 112 Texas Crim. Rep., 284, 16 S. W. (2d) 240, and Hudson v. State, 107 Texas Crim. Rep., 330, 296 S. W., 573.

Bill of exception No. 7 shows, in substance, that the arresting officer Howerton, in following tracks from the filling station to appellant's residence, called appellant to the door and told him that he was making a little investigation and wanted to see if he could give him some information; that he asked appellant if he heard any shots down near the filling station; that appellant answered in the negative; that before he told appellant he had found deceased's body, appellant said that deceased was a good old man and that he had been down there about 2 o'clock and not after that. Appellant objected to the testimony of the officer on the ground that he was in custody of the officer and that the provisions of article 727, C. C. P., had not been complied with. Appellant testified that on the occasion in question he went with the officer from his home to the filling station, and that the officer did not have charge of him at the time, but that he just accompanied the officer to the station. The officer testified that he had no intention of arresting appellant when he came to the door and did not feel that the tracks alone were sufficient to justify him in making the arrest. He said he did not decide to arrest appellant until appellant made the statement to him relative to deceased being a good old man. Moreover, he testified that he did not indicate to appellant in any way that it was his purpose to place him under arrest, as it was only his entire purpose to get information. Defendant's own testimony negatives the idea that he believed himself to be under arrest at the time he made the statement in question to the officer. The officer's testimony affirmatively shows that appellant was not under arrest. It is true that the fact that the officer had not taken appellant into custody prior to his conversation with him would not be controlling in determining whether the receipt of the statement was inhibited by the statute. The impression made upon the accused is to be taken into account. Lightfoot v. State, 117 Texas Crim. Rep., 515, 35 S. W. (2d) 163. In Burton v. State, 102 Texas Crim. Rep., 110, 277 S. W., 390, Judge Hawkins, speaking for the court, used language as follows: "Whatever be the intention of the officer, if he had not arrested accused and accused was not apprised of his intention to arrest him at the time the statements are made, they are admissible, if accused did not

reasonably believe himself to be under arrest. It is not altogether the intention of the officer that governs the matter."

A careful examination of appellant's contentions leads us to the conclusion that reversible error is not presented.

The judgment is affirmed.

*Affirmed.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON MOTION FOR REHEARING.

MORROW, PRESIDING JUDGE.—The facts are set forth with accuracy and discussed in detail in the original opinion. The disposition of the contention of the appellant that there was error in the reception of evidence to the effect that there was a shell from a shotgun found upon the porch of the appellant's dwelling after his arrest and the use of the evidence pertaining to it upon the trial is vigorously attacked in the motion for rehearing. Our view of the subject, as reflected in the original opinion, was that although the shell which was found upon the appellant's porch may have been improperly received in evidence, the error committed was harmless. In making that announcement we, for the moment, lost sight of the fact that the evidence of the appellant's guilt was wholly circumstantial. Reviewing the subject, it may be stated that there appears in the record no legal basis for the search of the appellant's dwelling without a search warrant. The arrest of the appellant was not justified by any of the provisions authorizing an arrest without a warrant, such as are set forth in title 5, C. C. P., 1925. The testimony of the officer who arrested the appellant revealing the conditions that came to his knowledge while in the presence of the appellant and in his dwelling, though obtained by an unauthorized arrest, was not available to the accused as ground for a reversal of the judgment for the reason that the officer's declaration touching the matters just mentioned was verified by the testimony of the appellant while testifying in his own behalf. The appellant gave no testimony showing the presence of the shotgun shell which, according to the arresting officer, was picked up on the porch of the appellant's dwelling. The officer disclaimed the acquisition of any knowledge of the presence of the shotgun shell mentioned at the time of the appellant's arrest. Touching the presence of the shotgun shell mentioned upon the porch of the appellant's dwelling, the officer's knowledge, according to his testimony,

was acquired after he had taken the appellant away from his dwelling and placed him in jail. After having arrested the appellant and departed from his dwelling, the legality of the officer's action in returning to the dwelling and making the additional search which resulted in the finding of the shotgun shell, is deemed to have been without support in the law. This is true, first, for the reason that, as above stated, the action of the arresting officer was illegal; and second, for the reason that having completed the search, the return of the officer and the re-entry of the dwelling were violative of the provisions of the Constitution and the statute against unreasonable searches and seizures. See Stokes v. State, 117 Texas Crim. Rep., 307, 35 S. W. (2d) 727, and cases therein cited; also Davis v. State, 113 Texas Crim. Rep., 421, 21 S. W. (2d) 509.

The introduction in evidence of the officer's testimony showing the result of the subsequent search, namely, the finding of the cartridge upon the porch of the appellant's dwelling, was opposed by article 727a, C. C. P., of this state. Upon this review, it becomes necessary, therefore, to deal with the appellant's complaint of the reception of the evidence of the finding of the shell and the use made thereof upon the trial in the light of the fact that the evidence against the appellant was wholly circumstantial. The presence of the shell upon the appellant's porch is vouched for by the testimony of no witness save Howerton, the officer who made the arrest. Excluding his testimony, there was before the jury no evidence of the presence of the shell. Based upon Howerton's evidence, however, the shell was used as a basis for experiment and for opinion testimony against the appellant, as indicated in the original opinion.

In the motion for rehearing attention is drawn to the fact that at the filling station two shots were fired: One entering the body of deceased, the other being embedded in the door of the filling station.

From the appellant's supplemental argument on motion for rehearing, the following quotation is taken: "An empty shotgun shell was found near the body of the deceased. Certain witnesses testified to having heard two shots fired. Other testimony showed that a charge of shot went into the filling station conducted by the deceased, and that another charge of shot from a shotgun went into the body of the deceased and resulted in his death. The state could account for one of the shotgun shells. That one was found near the body of the deceased. There was testimony to show that at about the time of the homicide certain persons were at the deceased's filling station

with an automobile, and that there was a double-barreled shotgun in this car. This circumstance was sufficient to lead some minds to believe that the deceased met his death at the hands of these parties and not the appellant. In the prosecution's attempt to draw its chain of circumstances about the appellant and to exclude every reasonable hypothesis except his guilt, it became important to show what had become of the second shotgun shell that had been fired. This circumstance in the chain of evidence was supplied by the finding of the empty shotgun shell on the north porch of the appellant's home with a mark made on the cap by the plunger or firing pin corresponding to the mark made on the cap by the plunger or firing pin of the gun that had been used to fire the shell found near the deceased's body. Thus the prosecution was given a basis of fact upon which it could argue that the appellant fired the first shot at the deceased and missed, the charge of shot entering the filling station; that he fired the second shot into the body of the deceased, which resulted in his death, and that he did not reload his gun (it being a single-barrel shotgun) until he reached his home; that the reloading took place on the north porch of the appellant's home, and that he left the shell which was fired in the second shot on the north porch of his home, where it was found by the witness Howerton. That the finding of this shell and the similarity of the marks on it to those found on the shell found near the body of the deceased was not damaging to the appellant, and that it did not form an important link in the prosecution's chain of circumstances, will not be contended by any who are familiar with the trial of homicide cases before juries. The meaning and effect of the testimony regarding the finding of this shell on the porch of the appellant's home, and the similarity of the marks on it with those on the shell found near the body of the deceased, upon the appellant's case was evidently adverse to the appellant, and how great an influence it had upon the jury in arriving at its verdict is impossible of statement. It was a cogent, material, incriminating fact that helped produce in the minds of the jury a reasonable and moral certainty that the appellant, and no other person, committed the offense charged against him."

Being convinced that in receiving the testimony touching the shell discussed hereinabove and the treatment thereof revealed by the record, as pointed out in this opinion, there was committed error prejudicial to the accused and calculated to impair his right to a fair and legal trial, the motion for rehear-

ing is granted, the order of affirmance is set aside, the judgment of the trial court is reversed and the cause remanded.

*Reversed and remanded.*

LATTIMORE, JUDGE (dissenting).—I regret not to be in accord with my associates in every case. In this case an officer without warrant was seeking to ferret out and bring to justice the slayer of a man who had been killed at a filling station on a public highway in the late afternoon. The scene of the killing and the arrest of appellant for the murder, was some seven miles from the county seat, and unquestionably many miles from any magistrate before whom complaint could be filed after investigation, and by whom a warrant of arrest could have been issued. The officer referred to went from the county seat at once upon information, to the scene. He viewed the dead body, observed the character of the wounds, saw a shotgun shell near by on the ground, saw a hole in a door which had been made by the passage of a charge from a shotgun. Examining the ground he discovered the fresh tracks of a horse leading away. These he followed south some three hundred yards until he came to a gate leading west into appellant's place. Here he observed the fresh tracks of a man, and gave his attention to these. They led to appellant's dwelling near by. Observing no one as he came to the house, the officer called. Appellant came to the door. The officer told him he was making an investigation and wondered if appellant could give him any information. Appellant said no, and the officer asked if he had heard any shots fired around the filling station. To this appellant answered no. The house was located some three hundred and fifty yards from the filling station. After making the last answer set out, and at a time when no one had said anything about deceased being killed, the officer testified that appellant hesitated for a moment and then said: "That old man was a good old man. I was down there at two o'clock, and haven't been back since." When he made this statement the officer arrested him, went inside the house, and while appellant was changing his shoes and garments the officer observed the things, testimony regarding which is set out in bills of exception 4, 8 and 9, discussed in our original opinion herein in which the case was affirmed. Other information may have been possessed by the officer pointing to appellant as the slayer. No particular effort to bring such out appears.

In the opinion on rehearing reversing the case it is stated that there appears in the record no legal basis for the search

of appellant's dwelling without a search warrant, which statement is based on the further announcement that the arrest of appellant was not justified by any provisions of our law, there referred to. I cannot bring myself into agreement with such proposition, and believe same carried to its logical sequence will greatly handicap peace officers in doing their duty, and the administration of justice in the trial of criminal cases. Article 215, C. C. P. makes it the duty of every peace officer to arrest without warrant when it is shown by satisfactory proof, upon representation of a credible person, that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a warrant. Every law must be given reasonable interpretation. If the officer in question, as a result of personal observation or ascertainment acquires proof satisfactory that a felony has been committed, and that the offender is in his presence, it would appear to be his duty to arrest him. If confronted with choice whether he will either arrest and detain the offender without warrant, or leave him unarrested and not detained and go miles to where he can secure a warrant such officer should have, and in the opinion of the writer has, the right to arrest without warrant, under the command of the statute referred to.

It would be idle to say that because the offender be not in flight at the moment of proof to the satisfaction of the officer, that the latter can not say such offender *is about to escape.* Nor would assurance from such offender by word or act, under such circumstances, that he would make no effort to escape, justify the officer in leaving him unarrested while the officer travels to some distant magistrate or to the county seat for a warrant. To so lay down such rule would compel an officer, observant thereof, though satisfied from what he has seen and heard that one then in his presence has committed murder, robbery, or other felony, to forego the arrest and detention, because forsooth the offender be on his own premises, or assures the officer in some manner that he will not flee while a warrant is being procured. This is not the law, and in an age of increasing crime and ease of escape, it is hoped it will never become such by pronouncement of this court. The statute referred to, analyzed, clearly says that upon proof satisfactory *to the peace officer* of two things, viz: (1) that a felony has been committed, (2) that the offender is about to escape so as that there is no time to procure a warrant, he must arrest without warrant. Article 37, C. C. P., says: "He shall arrest offenders without warrant in every case where he is authorized

by law, in order that they may be taken before the proper magistrate or court." Peace officers are not lawyers or judges, but men charged with the conservation of the peace, and in most cases the protection of society, and the exercise of their discretion in matters such as are here set forth should not be overturned or revised except possibly in cases clearly evidencing some abuse, which latter is wholly absent in this case. The record shows that in this connection, and as a predicate to the admission of this testimony, the jury were twice retired by the trial court while he heard evidence to enable him to determine whether the officer's testimony was admissible, and what he then heard is not here set out.

The officer knew that a felony had been committed, that is, a man had been killed by a shot from a shotgun; that appellant was the nearest dweller; that fresh tracks led to appellant's house; that the crime was committed late in the afternoon; that appellant said he had not been down to the scene since 2 o'clock, a statement which the officer may have known to be untrue; that he heard no shots; that without information that a killing had taken place, appellant made statements clearly indicative of his knowledge that the old man who was a good old man, was no longer in the land of the living. What was the officer to do? Here was a man of whose guilt the officer plainly believed himself to have satisfactory proof. If he had gone without arresting in such case and the accused had gotten in a car and traversed the few miles over the highway to the border of our sister state of Oklahoma, the officer would likely have had serious difficulty in escaping just criticism, if not more serious consequences. Authorities are collated in the notes of Mr. Vernon's Annotated C. C. P. under article 37 and article 215 thereof. In Rutherford v. State, 104 Texas Crim. Rep., 127, speaking through Judge Morrow, this court said: "It is true that the law does not demand that the officer possess superhuman foresight, nor that he do more than what comports with reason, taking into account the emergency of the occasion." The rule is then laid down that the demand of the law is that its restrictions be in good faith observed, and be not willfully ignored or captiously disregarded. In the well considered case of Hepworth v. State, 111 Texas Crim. Rep., 307, opinion by the same judge, and upon construction of a statute and a state of facts not so demanding as here, it is said: "The facts in evidence were apparently in possession of the officer at the time he made the arrest and justified it under either article 215 or article 325, supra." In said case the officer

was only in possession of information that a theft had been committed, and had a description of the supposed thief, who was found on a public street of a city within whose limits a magistrate could have been reached in a few moments, but the officer's arrest of the accused was held legal in such case. I again say that I can not agree to the proposition that the accused was illegally arrested in this case.

Nor can I assent to the engrafting on the law of this state by judicial construction further extensions of the doctrine of the rejection of evidence material to the ends of justice, which would be held admissible but for such extended construction of the so-called search and seizure law under which men who have committed burglaries and thefts and murders, and probably other offenses, have taken and will take shelter. I refer to the proposition that if the officer could give testimony legally as to what he saw and observed coincident with the arrest of appellant, that what he there saw and found a few moments later could not be legally received in evidence. As said by Judge Morrow in Stokes v. State, 117 Texas Crim. Rep., 307, 35 S. W. (2d) 727: "No precedents have been discovered indicating that the right to search the premises in which the crime was committed, would cease with the arrest. There are cases holding that, after the arrest of one accused of crime and his incarceration, a search of the premises without warrant would be illegal. Touching the soundness of which holding we express no opinion." I undertake to say that in no case which can be found has it ever been held that if the arrest be legal and the accompanying search be also legal, or there be an otherwise legal search of premises, that a *search of the same premises,* by the same officers a few moments after accompanying the accused a distance of a few hundred yards, or to the nearest place of confinement and there turning him over to others, followed by an immediate return to the same premises and a further search thereof, would be illegal. The right to search the place where the accused is legally arrested being conceded, the right to make thorough search would seem also necessarily admitted. What search could be made by an officer who has in his custody the accused? What sane or reasonable ground of objection could be interposed to the return of the officer after taking the accused out to the street, or a short distance away to some other officer or place of confinement, and then returning to the place originally searched, to complete such search? Such is not the doctrine of the Stokes case, supra, nor the Davis case, 113 Texas Crim. Rep., 421, 21 S. W. (2d) 509, nor

any other case in our state, or elsewhere, as far as I know. To so hold would lead to the absurdity that though legally in, and legally entitled to search, if the officer step outside the door, his right has vanished, and when he returns he is a trespasser or violator of the law. The people of this state suffer from unpunished crime, some of which unfortunate state of affairs flow from necessary application of the statute rejecting evidence when he who is prepared to give same has wittingly or otherwise overstepped the supposed right of some criminal in his effort to ferret out crime or overtake the offender. In such case this court has no other course to follow except to give effect to the law as written in the statute books, but to agree to the rule under discussion, now for the first time sought to be given application in this state, seems to the writer to be going too far. The officer in this case, after arresting appellant and observing what was in the room, while appellant put on his garments, accompanied appellant to the filling station, turned him over to another officer, and returned to the house, as above stated, a distance of some three hundred and fifty yards, at which time he then discovered on the porch of the house another shot gun shell, which was offered in evidence and made the subject of comparison by experiments, and now, for the first time, held inadmissible in evidence. The officer was not clear as to whether he discovered this last shell upon the occasion of appellant's arrest, or when he returned after taking appellant to the filling station; but I am taking the position that it would make no difference at all in law as to the admissibility of the testimony, whether he found it at the time of and immediately coincident with the arrest of appellant, or whether he found it on the same premises a few moments later when he returned and completed his search.

I am further of the opinion that the bills of exception presenting complaints of these matters are in such condition as that if the rules applied in numerous cases be applied here, the complaints of the reception of the evidence would be unavailing. These bills of exception group things said by the witnesses, set out some times at great length, and many of which statements are admissible, and then present objections in solido to the whole of the bills. As against the availability of bills of exception in this form, I call attention to what we said in Rogers v. State, 102 Texas Crim. Rep., 444; Hock v. State, 97 Texas Crim. Rep., 354; Smith v. State, 92 Texas Crim. Rep., 300; Spears v. State, 91 Texas Crim. Rep., 51; Gibson v. State, 88

Texas Crim. Rep., 281; Surginer v. State, 86 Texas Crim. Rep., 438, and numerous authorities which might be cited.

I recognize the futility of a dissenting opinion, but feel that I cannot, in justice to my own views in regard to the matters above discussed, hold otherwise; and I therefore respectfully dissent.

### ON STATE'S MOTION FOR REHEARING.

HAWKINS, JUDGE.—In our opinion dated June 24th, 1932, granting appellant's motion for rehearing, we said the arresting officer had taken appellant away "from his dwelling and placed him in jail." In the state's motion for rehearing the inaccuracy of that statement was called to our attention. We should have said that appellant had been taken away "from his dwelling and placed in custody of another officer." The original opinion has been corrected in accordance with the facts.

In the state's motion for rehearing it is strenuously urged that the arrest of appellant was legal. Article 215, C. C. P., provides "Where it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, *and that the offender is about to escape,* so that there is no time to procure a warrant, such peace officer may without warrant pursue and arrest accused." It is not necessary to discuss whether circumstances discovered by a peace officer himself, and which led him to believe that a party has committed a felony, may be substituted for the provisions of the statute which says that the information must reach the officer upon representations of a credible person. That part of the statute which says that "the offender is about to escape" is indispensable. That such condition did not exist in the present case seems to be without dispute in fact. At the time the officer went to appellant's house, appellant was partially undressed and in bed. In Cortez v. State, 44 Texas Crim. Rep., 169, it was said that it was not shown that Cortez was about to escape, but: "* * * on the contrary, the evidence is to the effect that he was at home in the county, engaged in making a crop, and that after the sheriff learned of his whereabouts, on the morning of the homicide, he was then within six miles of the justice of the peace, and could have obtained a warrant had he so desired."

We think nothing is to be gained by a further discussion of whether evidence of the empty shell being found on appellant's porch was harmful. The matter was given careful consideration when appellant's motion for rehearing was before us. Our minds have not been changed in regard to the question.

The state's motion for rehearing is overruled.

*Overruled.*

JUDGE LATTIMORE adheres to the views expressed in his dissenting opinion at the time appellant's motion for rehearing was granted.